UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL S. WAMPOLD and DINA L. WAMPOLD, husband and wife and the marital community composed thereof,

Plaintiffs,

v.

SAFECO INSURANCE COMPANY OF AMERICA, a non-Washington Corporation,

Defendant.

C19-169 TSZ

ORDER

THIS MATTER comes before the Court on Plaintiffs' Motion for Partial Summary Judgment, docket no. 10, and Defendant's Cross-Motion for Partial Summary Judgment, docket no. 17. Having reviewed all papers filed in support of, and in opposition to, the motions, the Court enters the following order.

**Background**

Plaintiffs Michael and Dina Wampold (together, "the Wampolds") live at the top of a steep slope on Mercer Island. They are insured under a homeowners insurance policy issued by Defendant Safeco Insurance Company of America ("Safeco"). That

ORDER - 1

policy (the "Policy") provides both property and liability coverage for the Wampolds. On December 9, 2015, during a large rainstorm, a landslide occurred on the Wampold property. As a result, the City of Mercer Island ("City") issued a "red-tag," which prohibited the Wampolds from reoccupying their home until they obtained a geotechnical report and complied with that report's recommendations. Pursuant to the City's directives, the Wampolds obtained geotechnical reports, which concluded that the property was safe to occupy, proposed a monitoring program, and recommended long-term slope stabilization repairs. The Wampolds implemented the reports' recommendations, including by working with their neighbors, the Suns, to build a retaining wall on their properties. The Wampolds agreed to pay for approximately $800,000 of the retaining wall project, and after it was completed sought indemnity from Safeco pursuant to the liability coverage on their Policy. Safeco reserved its rights and has declined to pay, claiming (1) that the red-tag is not a "claim" for purposes of the Policy, (2) that the retaining wall is designed to remedy damage to the Wampolds' property and is therefore excluded from coverage by the "owned property" exclusion in the Policy, and (3) that the Wampolds' request was untimely.

In light of Safeco's refusal to pay, the Wampolds' filed this action, alleging six claims: declaratory relief, breach of contract, insurance bad faith, negligence, violation of the Consumer Protection Act, and violation of the Insurance Fair Conduct Act. Safeco answered the complaint, and the parties promptly filed cross-motions for partial summary judgment to resolve the coverage issue.

**I.      Landslide**

The landslide on and near the Wampolds' property affected two downslope properties. *See* Declaration of Michael S. Wampold ("Wampold Decl."), docket no. 13, ¶¶ 4-5. One of the downhill properties damaged was owned by Johnny and Myoung Leong. The slide filled their backyard with debris and damaged their roof. *Id.* ¶ 6. That same day, the City issued a "red tag" prohibiting the Wampolds from occupying the property "until investigation, mitigation [and] a supporting opin[ion] by a Washington state licensed geotechnical engineer that [the home] is safe to occupy is submitted to the building official." *Id.*, Ex. A. Two other nearby homes, including the Leongs', also received red tags.

**II.     Inspections and Proposed Remediation**

Several geotechnical inspections and reports ensued. The first, by Nelson Geotechnical Associates, Inc. ("NGA"), concluded in a December 17, 2015 report that conditions at the Wampold property did not "pose an immediate hazard" to the Wampolds and expressed no objection to the City lifting the red tag. Declaration of Charles L. Vita, docket no. 18, Ex. 2(a), at 41. The NGA report also stated that further permanent slope stabilization work would be required. *Id.* at 42. The report stated as follows:

> Although the residence is supported on pin piles and no distress within this structure was observed, it is possible that continued erosion of the steep slope will eventually impact the residence foundation if adequate measures for stabilizing the affected area is [sic] not implemented in the near future. Therefore our opinion is conditioned on the assumption that the ground slope adjacent to the house will be reconstructed to re-establish a protective buffer around the exposed pin pile, that broken storm and sewer drain lines will be

> replaced and made functional again and that the damaged slope will be remediated to protect against erosion. . . . A geotechnical evaluation of the slope to develop recommendations for restoring the ground surface and installing permanent erosion control measures may be postponed only until weather conditions are more appropriate for working on the slope. We do not anticipate that this delay will materially impact the stability of the house but the foundation and slope should be monitored on an on-going basis, especially during the wet season, for any changes, and corrective actions promptly taken should any signs of instability be observed. Engineering work related to permanent stabilizations measure [sic] should commence as soon as possible.

*Id.*

Mitigation work progressed in two phases: initial emergency work that permitted the Wampolds to conditionally re-occupy their home under a "yellow tag," and a later permanent repair. Declaration of Robb A. Dibble ("Dibble Decl."), docket no. 12, ¶ 9; *see also* Wampold Decl., Ex. B.

On January 4, 2016, Dibble Engineering, Inc. ("DEI"), retained by the Wampolds, issued a Structural Review Summary. *See* Dibble Decl., docket no. 12, ¶ 7. The DEI report concluded that the Wampold property was safe for occupancy, and like the earlier NGA report recommended that "additional slope stabilization be completed during the upcoming dry season" to provide safety and stability. Vita Decl., Ex. 2(d), at 61.[1] The report by DEI stated that "as a condition of removing the Red/Yellow Tags, the City of Mercer Island required the Wampolds to perform mitigation, engineering, and construction work on their property that was necessary to prevent further harm to the

---

[1] Other reviews commissioned by neighbors impacted by the slide similarly concluded that their homes were safe for occupancy. *See* Vita Decl., Ex. 2(c) (NGA report regarding Teutsch/Grimstad property); Ex. 2(g) (GEO Group Northwest report regarding Leong property).

Leong property." Dibble Decl., docket no. 12, ¶ 12. The Wampolds shared the reports with the City on January 4, 2016 and asked that the yellow tag be removed. *See* Wampold Decl., docket no. 13, Ex. C, at 13. On January 7, 2016, the City asked the Wampolds to provide written confirmation from a geotechnical engineer that "mitigation measures were inspected and installed in accordance with their recommendations, and that their recommended monitoring program will be fully implemented in a timely manner." *Id.* at 12. The City made no statement explicitly requiring additional stabilization work. On March 25, 2016, the City sent a follow-up email requesting confirmation that "temporary mitigation measures [were] properly installed" and reminded the Wampolds that "continued occupancy of your home remains subject to receipt and satisfactory resolution" of that confirmation, and that failure to provide it would mean" that the conditions of occupancy have not been met and further actions may become necessary." *Id.* at 10. In April of 2016, Michael Wampold emailed City officials to request that the City reconsider its requirement of ongoing monitoring. *Id.*, Ex. D at 17. Wampold explained that the monitoring was expensive and "burdensome and unnecessary" "[s]ince we also are incurring the cost of investigating a long term solution to the slide problem on this hillside." *Id.* The City responded that although there were no restrictions on occupancy of the Wampolds' house, "the monitoring is a requirement of your geotechnical engineer's opinion that the home can be occupied prior to the installation of permanent mitigation measures." *Id.* at 16. The City explained that unless the geotechnical engineer's opinion about monitoring had changed, the Wampolds would need to submit the monitoring reports, without which the City "may be required to take

enforcement action." *Id.* The engineer responded to this exchange, stating that monitoring should continue "as the permanent stabilization is designed." *Id.*

On June 17, 2016, NGA provided the Wampolds and Grace Sun (an adjoining neighbor) with a Geotechnical Engineering Evaluation as part of their ongoing monitoring program, which concluded in part that "slope stabilization measures are needed at the site to protect existing structures" on their properties and that NGA was recommending "soldier pile cantilever retaining walls located near the upper part of the landslide zone to support the soils in that area." Vita Decl., Ex. 2(f) at 69. DEI designed the retaining wall. *See* Dibble Decl., docket no. 12, ¶ 10. After the wall on the Wampold and Sun properties was completed in 2018, the City emailed the Wampolds to set up a time for a final inspection. The Wampolds spent approximately $800,000 on the stabilization project. Wampold Decl., docket no. 13, ¶ 14.

**III. Indemnification for Retaining Wall**

In December 2017, before the wall was completed, the Leongs sued the Wampolds for damage related to the landslide. *See* Wampold Decl. ¶ 11. Safeco agreed to defend under a reservation of rights. *Id.*; *see also* Ex. E at 24. During this litigation, on October 1, 2018, the Wampolds asked Safeco to indemnify them for their share of the cost of stabilizing the hillside.[2] *See* Wampold Decl. ¶ 13 and Ex. G at 32. The Wampolds relied on their liability coverage contained within their Policy, which states

> If a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to

---

[2] A jury ultimately returned a verdict of no liability against the Wampolds in the Leongs' lawsuit.

ORDER - 6

which this coverage applies, we will . . . pay up to our limit of liability for the damages for which the insured is legally liable.

*Id.*, Ex. H at 50.

The Policy defines property damage as "physical damage to or destruction of tangible property, including loss of use of this property." *Id.* at 61. Occurrence is defined as "an accident, including exposure to conditions which results in: (1) bodily injury; or (2) property damage; during the policy period." *Id.* at 60. The terms "claim" and "damages" are not defined.

Safeco has refused to pay the Wampolds' costs related to the permanent stabilization work. It argues that those costs are not covered under the Policy because they are not "the subject of a claim against the Wampolds for damages because of property damage caused by an occurrence." *Id.*, Ex. G at 33.[3] Safeco also argues that even if the costs were covered, they are excluded by the "owned-property" exclusion and because the Wampolds failed to give timely notice of their claim. *Id.* at 34.

**Discussion**

The parties' cross-motions raise four issues: (1) did the City's actions constitute a "claim" for "damages" under the Policy; (2) is the "owned property" exclusion applicable to the permanent stabilization work; (3) did the Wampolds timely inform Safeco of the stabilization work and their request for indemnity; and (4) are the Wampolds judicially estopped from arguing that they are liable for damages related to the landslide.

---

[3] The slide was an "occurrence" as defined by the Policy.

ORDER - 7

## I. Standard of Review

Generally, the "[i]nterpretation or construction of an insurance contract is a question of law and may properly be determined on motion for summary judgment." *Gerken v. Mut. of Enumclaw Ins. Co.*, 74 Wn. App. 220, 225, 872 P.2d 1108 (1994). The burden is on the Wampolds to prove that the Policy covers their loss, and then the insurer has the burden of proving the loss is excluded. *See Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 431, 38 P.3d 322 (2002). Undefined policy terms should be given their "plain, ordinary, and popular meaning." *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990) (quotation marks omitted). If policy language is ambiguous, a court must apply the interpretation most favorable to the insured. *See Shotwell v. Transamerica Title Ins. Co.*, 22 Wn. App. 381, 588 P.2d 208 (1978).

## II. Coverage

The Policy does not cover the permanent stabilization work because although it was required by the City, it did not constitute a claim for damages for which the Wampolds were legally liable. The Policy only covers expenses if "a claim is made or a suit is brought against any insured for damages because of . . . property damage caused by an occurrence to which this coverage applies." Wampold Decl., Ex. H at 50.

The Wampolds argue that because "claim" is undefined in the Policy, the City's red tag and resulting directives are a "claim" under the term's ordinary meaning. Webster's Third defines "claim" as "an authoritative or challenging request: demand." Webster's Third New Int'l Dictionary, Unabridged, 414 (3d. ed. 2002). The City required the Wampolds to obtain a geotechnical engineer's opinion and comply with that

opinion before reoccupying the house. Failure to do so would, the City warned, result in enforcement action. The engineer did in fact recommend permanent hillside stabilization work. Although the City required the further, permanent stabilization work, that action did not constitute a "claim or suit brought against" the Wampolds, for which they are "legally liable" to another because of "property damage." The Wampolds were not legally liable to the City or to their neighbors for any damages. In the cases the Wampolds cite, legal liability for damages or injunctive relief is authorized by statutes giving the government a property interest in the damaged groundwater or soil.

For example, in *Olds-Olympic, Inc. v. Commercial Union Insurance Co.*, the plaintiff insured operated a home heating oil distribution facility that contaminated soil and groundwater in Seattle. That contamination exposed the plaintiff to potential legal liability under the Model Toxic Control Act. 129 Wn.2d 464, 472, 918 P.2d 923 (1996) ("The general basis for the legal liability of Olds-Olympic to the State of Washington or by contract to the Singletons and Fremont Dock for their liability to the State of Washington is the Model Toxic Control Act of 1989. . . . [A] past or present property owner is strictly liable for the remediation of environmental hazards caused by hazardous substances it released or were released on its property.") The Washington Department of Ecology required Olds-Olympic to clean up the contamination, and Olds-Olympic's insurers refused to pay. The Court held that the owned property exclusion was "inapplicable . . . with respect to groundwater," because groundwater belongs to the State. *Id.* at 480. The Court also noted that "it would be a 'reasonable reading' of a CGL

policy to conclude there is coverage even prior to a suit or formal claim *where a statute imposes liability* and there has been property damage." *Id.* at 473 (emphasis added).

The Ninth Circuit reached a similar conclusion in *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551 (9th Cir. 1991). In that case, Intel entered into a consent decree with the EPA to remediate a contaminated site. The insurer refused coverage, arguing that the injunctive relief and reimbursement sought by the government did not constitute "damage," and that in any event coverage was barred under the owned property exclusion. The Ninth Circuit upheld a decision on summary judgment finding coverage as a matter of law. Citing California law, the court concluded that Intel was legally obligated to comply with an injunction and pay cleanup costs under CERCLA for damage to the government's property interest in groundwater. *Id.* at 1562-66. "Release of hazardous waste into groundwater and surface water constitutes actual harm to property in which the state and federal governments have an ownership interest." *Id.* at 1565.

In *Boeing v. Aetna*, the Washington Supreme Court held that money paid by Boeing for environmental clean-up costs under CERCLA constituted "damages." 113 Wn.2d at 873. "Standard dictionaries uniformly define the word 'damages' inclusively, without making any distinction between sums awarded on a 'legal' or 'equitable' claim. For example, *Webster's Third New International Dictionary* 571 (1971) defines 'damages' as 'the estimated reparation in money for detriment or injury sustained.'" *Id.* at 877. The Court rejected the argument that "damage" should be limited to remedies at law instead of encompassing money paid as restitution or to comply with an injunction.

*Id.* Moreover, the Court specified that the form of action does not matter, as long as the person making the claim uses "actual or threatened use of legal process to coerce payment or conduct by a policyholder." *Id.* at 878 (citation omitted). *Boeing* gave "damage" its common meaning, but still required a legal or statutory basis for imposing those damages. In *Boeing*, the court noted that CERCLA provided that basis by making "any person or business entity responsible for a release or threatened release of hazardous substances . . . 'liable for . . . all costs of removal or remedial action incurred by the United States Government or a State . . . ." *Boeing*, 113 Wn.2d at 874 (quoting 42 U.S.C. § 9607(a)(4)(A)).

Here, there is no statute imposing liability on the Wampolds, and the City itself was not damaged by the Wampold slide. Unlike the State in *Olds-Olympic*, the City did not own any property that was damaged by this landslide.[4] The City's decision to exercise its police powers is not analogous to the City seeking redress for damage to its property. The Washington Supreme Court has expressly distinguished between a general

---

[4] Although the Wampolds were sued by the Leongs related to the slide, the Wampolds are not arguing that the permanent stabilization work is in any way related to any *liability* to the Leongs even if that work arose out of the same *property damage*. In the Leong litigation, the Wampolds—through a defense provided by Safeco—argued that they did not have any liability to the Leongs as a result of the slide. *See* Declaration of Sarah Eversole, docket no. 19, Exs. 4-6 (motions filed by Wampolds in Leong litigation). And in fact, a jury found the Wampolds were not liable to the Leongs for damages related to the slide using the standards for land owner liability set forth in *Price v. City of Seattle*, 106 Wn. App. 647, 24 P.3d 1098 (2011). *See* Eversole Decl., docket no. 19, Ex. 8 (jury instructions from Leong litigation). Here, by contrast, the Wampolds' sole argument that the stabilization work should be covered by the Policy is that the work was required **by the City** in order to lift the red tag on the Wampold property. *See* Pltfs.' Combined Reply and Opposition, docket no. 23, at 11. However, nowhere does the City indicate that it was requiring remediation efforts from the Wampolds on behalf of the City or neighboring properties such as the Leongs. The Wampolds were only required to remediate and stabilize their own property as a condition of occupancy on their own property.

exercise of government police powers and the government possessing a claim for damages. "While the State undoubtedly has a police power interest in regulating the environment, that interest does not rise to the level of a property interest cognizable under present insurance contracts." *Olds-Olympic*, 129 Wn.2d at n.18.

The Wampolds rely on an unpublished opinion involving a landslide that began on an insured's property and spilled onto and damaged neighboring properties owned by the City of Portland and others. *See Spada v. Unigard Ins. Co.*, 80 Fed. App'x 27 (9th Cir. 2003) (unpublished). The Ninth Circuit reversed the district court's conclusion that the insureds were not "legally liable" "because a jury had concluded in the underlying action that the City and the McCormicks were 100 percent at fault for causing the landslide and awarded damages to the Spadas." *Id.* at 30. The court went on to say that the "fact that the Spadas were not at fault for the landslide that caused the damage does not mean that they were not legally liable to remediate the hazardous condition on the property. They were required to do so pursuant to the City code and under threat of substantial fines, personal liability and further legal action." *Id.* On its face, the case shares many facts with the Wampolds' situation. However, in *Spada* it was undisputed that the City itself owned the right-of-way property that was allegedly damaged, and the Spadas were potentially liable to the City for that damage. Here, by contrast, the City has no property interest in the damaged property and has not asserted any claims on behalf of neighboring property owners.

The Wampolds have not identified any case in which a red tag—which is an occupancy restriction—has been found to be a claim for which an insured is legally

liable. That distinguishes this case from the other environmental clean-up cases, where the government **itself** had a claim against an insured for property damage. The Court declines to extend the holdings in environmental clean-up cases like *Olds-Olympic* and *Intel* to situations in which the government does not itself possess a property interest in damaged property for which the insured is legally liable. Here, the separate suit by the Leongs against the Wampolds resulted in a judgment of no liability. The City's red tag on the Wampold property was not a claim for those damages.

Even if the standard from strict liability environmental cleanup coverage actions applied to this dispute, as the Washington Supreme Court pointed out in *Boeing v. Aetna*, "preventative measures taken before pollution has occurred are not costs incurred because of property damage." The Court cited an analogy from a California appellate opinion:

> Petitioners have two underground storage tanks for toxic waste. Tank # 1 has leaked wastes into the soil which have migrated to the groundwater or otherwise polluted the environment. Tank # 2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures are taken. Response costs associated with Tank # 1 will be covered as damages, because pollution has occurred. Tank # 2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages."

*Boeing*, 113 Wn.2d at 886 (quoting *Aerojet-General Corp. v. San Mateo Cy. Superior Court*, 211 Cal.App.3d 216, 257 Cal.Rptr. 621 (1989)).

The parties dispute whether the permanent stabilization work is more like Tank #1 or Tank #2. The analogy is not perfect because this case involves a single slide and a

ORDER - 13

single slope. The slide undoubtedly caused damage, which would in theory make this more like Tank #1. However, the immediate clean up and repair has already occurred, and the more permanent stabilization work recommended by the geotechnical reports is explicitly designed "to provide an increased factor of safety and stability to the hillside and the associated foundation." Vita Decl., Ex. 2(d), at 61. This prophylactic measure is aimed at preventing future slides and associated damage, making this case much more akin to Tank #2 in the *Boeing* court's analogy. Even if the condition of the hillside could have caused damage to the Wampolds' neighbors in the future without corrective action by the Wampolds, that corrective action would not be covered by the Policy because the damage had not yet occurred. As a result, the Court concludes that there is no genuine dispute of material fact and the stabilization work does not constitute "damage" for which the Wampolds are legally liable under the Policy.

### III. The Owned Property Exclusion

Even if the Wampolds' permanent stabilization work was covered by the Policy as a claim for damages for which the Wampolds were legally liable, it nevertheless might be excluded under the "owned property" exclusion. *See* Wampold Decl., docket no. 13, Ex. G, at 34 (liability coverage does not apply to "property damage to property owned by any insured"). All of the improvements actually occurred on the Wampolds' and Suns' property. However, material issues of fact preclude summary judgment regarding the applicability of the owned property exclusion.

## IV. Timeliness

Safeco also argues that the Wampolds failed to give timely notice of their intent to seek indemnification for the cost of building the permanent stabilization features. However, there are material issues of fact that preclude a ruling on timeliness. In Washington, late notice that results in substantial prejudice to the insurer may relieve an insurer of its duty to indemnify. *See Unigard Ins. Co. v. Leven*, 97 Wn. App. 417, 427, 983 P.2d 1155 (1999), as amended (Apr. 24, 2000). The Wampolds did not request indemnification of their half of the permanent stabilization work until it was completed in 2018. However, Safeco managed the experts and tendered a defense in the underlying litigation between the Leongs and the Wampolds, which began almost a year before the indemnification request. This raises a question of fact as to whether Safeco was on notice that the Wampolds might ask for the project to be covered under the Policy. *See* Declaration of Charles K. Davis, docket no. 24, Ex. A at 15 (Safeco's retained attorney for the Wampolds informing Safeco in December 2017 that the Wampolds had "been proactive in improving the hillside stability"). Prejudice is also a disputed fact. *See Seattle Times Co. v. Nat'l Surety Corp.*, No. 13-1463, 2016 WL 6504091, *3 (W.D. Wash. Sept. 8, 2016) ("Prejudice may be presumed only in 'extreme' cases, and it 'will seldom be decided as a matter of law.'") (quoting *Port of Longview v. Arrowood Indem. Co.*, 2016 WL 4133121, *10 (Wn. Ct. App. Aug. 2, 2016)). Safeco's expert claims that because of lapsed time and altered site conditions, "it is no longer possible for me to conduct an independent evaluation based on site observations and testing on which to provide opinions . . . to a reasonable degree of geotechnical certainty." Vita Decl.,

docket no. 18, ¶ 7. The Wampolds' experts disagree. *See* Declaration of Timothy D. Huntting, docket no. 25, ¶¶ 9-13 (disagreeing with Safeco's expert, Charles Vita, that any delay prejudiced Safeco's experts when numerous reports, analyses, and photographs of the slide area had already been prepared). These disputes preclude summary judgment as to timeliness.

**V.     Estoppel**

Finally, Safeco argues that the Wampolds should be judicially estopped from claiming the permanent stabilization work is a covered loss because the Wampolds claimed that they were not liable for damage to the Leongs in the Leongs' lawsuit against them. One touchstone for an estoppel defense is that the party to be estopped took clearly inconsistent positions. *See, e.g.*, *Markley v. Markley*, 31 Wn.2d 605, 614-15, 198 P.2d 486 (1948). Here, Safeco argues that the Wampolds should not be permitted to "relitigat[e] the issue of whether they had any liability to the Leongs for the effects of the 2015 landslide." Safeco's Cross-Motion for Partial Summary Judgment and Opposition, docket no. 17, at 23. That is not what the Wampolds argue here, however, and the positions are not inconsistent. Indeed, the Wampolds have taken pains to separate any potential liability they had to the Leongs from the liability they argue they had to the City precisely because it is the City's directive to implement the permanent stabilization work that the Wampolds claim is a covered loss. *See* Pltfs.' Combined Reply and Opposition, docket no. 23, at 11 ("[T]he Wampolds aren't claiming to be liable to the Leongs for damage caused by the landslide."). Plaintiffs have, however, attempted to bootstrap potential liability to the Leongs into their current position by arguing that the City's

directive to stabilize the hillside was based on protecting the Leongs and preventing future, further damage to their property. The Wampolds have taken this position in order to bolster their arguments that (1) the permanent stabilization work benefitted other property and is not excluded under the owned property provision and (2) that the permanent stabilization work was undertaken because of property damage and was not entirely prophylactic. The Court need not reach the issue of judicial estoppel, but by picking and choosing when to highlight potential liability to the Leongs and when to disclaim it, the Wampolds may be slicing the proverbial salami a little too thin.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) Plaintiffs' Motion for Partial Summary Judgment, docket no. 10, is DENIED.

(2) Defendant's Cross-Motion for Partial Summary Judgment, docket no. 17, is GRANTED in part.

(3) The following claims were not addressed by the parties' cross-motions: the first claim for declaratory relief (solely relating to Safeco's alleged violation of regulations regarding Unfair Claims Settlement Practices), the third claim for insurance bad faith, the fourth claim for negligence, the fifth claim for violation of the Consumer Protection Act, and the sixth claim for violation of the Insurance Fair Conduct Act. Plaintiffs are ORDERED to show cause why the Court should not dismiss all remaining claims in light of this Order finding no coverage under the Policy. Plaintiffs shall file a brief of not more than fifteen (15) pages on or before September 26, 2019 in response to

this Order to Show Cause. Plaintiff shall note the matter for consideration on October 18, 2019. Defendant shall file a response of not more than fifteen (15) pages on or before October 14, 2019. Plaintiff may file a reply of not more than five (5) pages on or before October 18, 2019.

(4) The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 28th day of August, 2019.

Thomas S. Zilly
United States District Judge

ORDER - 18